[Civ. No. 11703. First Dist., Div. One. Oct. 31, 1941.]

DR. WALTER R. HUGHES et al., Appellants, v. FIRST NATIONAL BANK IN OAKLAND (a Banking Corporation) et al., Respondents.

W. S. Andrews, Harold M. Sawyer, Clifton Hildebrand, Fred J. Bills and Gladstein, Grossman, Margolis & Sawyer for Appellants.

C. Leonard Rosenberg and Errol C. Gilkey for Respondents.

PETERS, P. J.—Sarah R. Yoakum on February 8, 1929, created a trust in which the First National Bank of Oakland was named as trustee. The trust provided for the payment of the income to the trustor for life and upon her death the remaining trust estate was to be conveyed to her grand-nephew, plaintiff Dr. Walter R. Hughes. The trust further provided that it could be revoked, altered or amended by the trustor with the consent of the trustee. In January of 1935 the life tenant, the trustor, died. In February of 1936 Dr. Hughes, and his three children, assignees of Dr. Hughes, commenced the present proceeding. The complaint alleges that the trust was created; that it is still in force and effect; that Miss Yoakum has died; that a demand has been made upon defendants (the original trustee and its successor in interest) to turn over the principal of the trust; that defendants have refused to do so. It is further alleged, on information and belief, that the defendants, in violation of the trust, have delivered a considerable portion of the trust property to persons unknown, "and that as to any such property defendant First National Bank has been guilty of fraud, implied malice, and oppression." The facts constituting the alleged fraud are not set forth. Plaintiffs ask that the trust be enforced, for an accounting, for compensatory damages for breach of trust, and for exemplary damages.

In the answer of the trustee and its successor it is admitted that the trust set forth in the complaint was created in February, 1929, but it is denied that such trust is still in full force and effect. It is alleged that on June 21, 1929, the trust, upon the demand of the trustor and with the consent of the trustee, was revoked and terminated and that thereafter the entire trust estate was delivered to the trustor. As a second defense it is alleged that on February 6, 1930, Sarah R. Yoakum obtained a judgment in the Superior Court

of Tulare County against the plaintiff, Dr. Hughes, quieting her title to the property in the trust estate; that such judgment has become final; that such judgment determined that Dr. Hughes has no interest in the estate of Sarah R. Yoakum.

Several Does were named as fictitious defendants by plaintiffs. In due course, M. Louise Herod, individually and as special administratrix of the will of Sarah R. Yoakum, and her husband, Lester Herod, individually and as executor of the will, were substituted as defendants. These two defendants were granted a judgment of nonsuit.

The trial court found that the trust was created as alleged in the complaint; that such trust was revocable by the trustor with the consent of the trustee; that on June 21, 1929, the trust was revoked by the trustor with the consent of the trustee; and that thereafter the entire trust estate was delivered to the trustor. No findings were made on the affirmative defense of estoppel based on the Tulare judgment. Based on these findings, judgment was entered that plaintiffs take nothing by their action. From this judgment, plaintiffs prosecute this appeal.

Neither at the trial nor on this appeal do appellants challenge the fact that in June of 1929 the trustor demanded, and the trustee went through the form of consenting to, the revocation of the trust. It was the theory of the appellants on the trial, and it is their main contention on this appeal, that the uncontradicted evidence shows that the alleged revocation was secured as a result of the influence of certain designing persons by the name of Feyler, and that this fact was well-known, or should have been well-known, to the trustee. Based on these premises, it is urged that no valid revocation of the trust took place; that the trust is still in existence; that the trustee unlawfully and improperly returned the trust estate to the trustor; that the trustee is liable to the remainderman.

█ Preliminarily, something should be said about the nature of the cause of action here involved. If it be assumed that the evidence introduced by appellants tended to show that in June of 1929 Miss Yoakum was under the influence of Mr. and Mrs. Feyler, and that the demand for a revocation was the result of undue influence exercised by the Feylers, and further, if it be assumed, that such evidence tended to

show that the trustee gave its consent to the revocation with knowledge of such undue influence (and disregarding, for the moment, all conflicts in the evidence), nevertheless, there is something anomalous about the present cause of action. This is not an action against those persons who are alleged to have exercised the undue influence, nor against the persons who succeeded to the trust property upon the death of Miss Yoakum. It is true that if a trust is revoked as a result of undue influence, the beneficiary may hold those who receive the property gratuitously from the trustor as constructive trustees, and this even though such persons did not participate in the undue influence. But the present action is not against those who have succeeded to the title of the trust estate. It is an action to recover from the trustee the value of the trust estate on the theory that the trustee consented to a revocation of the trust knowing that such revocation had been procured by undue influence. This action was instituted upon the death of the trustor, and some six years after the property had been returned to the trustor. If the Feylers did exercise undue influence over Miss Yoakum, the uncontradicted evidence shows that such influence terminated in December of 1929. Yet Miss Yoakum remained in complete possession and control of the trust estate for the next five years without objection by the appellants. Miss Yoakum was apparently fully satisfied with the revocation during this period and made no effort to reinstate the trust. Then she died testate, convinced, apparently, that the trust had been validly revoked. Then appellant, Dr. Hughes, a gratuitous remainderman of a revocable trust, brought this action against the trustee to recover the full value of the trust estate on the theory that no valid revocation had taken place. Certainly, if the trustee was guilty of a breach of duty, it was a duty owed primarily to the trustor who was also the life tenant, and who had reserved the power to revoke, alter, or amend the trust with the consent of the trustee. Yet Miss Yoakum, after ridding herself of the influence of the Feylers as early as December of 1929, approved the action of the trustee by keeping the property and apparently disposing of what was left of it by will. To say the least, such actions on her part constituted a ratification of the actions of the trustee in consenting to what we have assumed was an improper revocation. It must be remembered that the contract cre-

ating the trust was between Miss Yoakum and the bank, and that Dr. Hughes was simply a gratuitous beneficiary of that contract. If there was a breach of contract by the bank it would seem quite anomalous that the gratuitous beneficiary should have a cause of action where the contracting party, under the circumstances, clearly would not have such an action. No doubt the trustee owes some duty to a gratuitous remainderman of a revocable trust. But this action is not based on the theory of breach of duty (an action which would probably long since have been barred by the statute of limitations), but on the theory that the trust has never been revoked, even though the trustor, after all undue influence had been removed, treated the trust estate as her own and apparently exercised testamentary control over any left at the time of her death. The basic theory of appellants is that the consent to the revocation under the circumstances was a fraud on the rights of the beneficiary and of the trustor. But the trustor, the one primarily interested, has never complained. Under such circumstances we have grave doubts as to whether the evidence introduced by appellants, giving to it the most favorable interpretation possible, proved a cause of action against respondents.

This was not the theory upon which the trial court proceeded. It simply held that the revocation of the trust in June of 1929 was valid. On this basic question the evidence, and the reasonable inferences therefrom, are in conflict. Under such circumstances, this court, under well-settled principles, cannot interfere with the finding of the trial court.

In 1929 Sarah R. Yoakum was over seventy-five years of age. The evidence shows that for many years prior to this time she had been on most friendly terms with her grandnephew, Dr. Hughes, and his family. It is conceded that she was keen of mind and mentally competent. Some time in 1928 she had become the owner of an orange ranch in Tulare County, and had gone there to manage the property, intending to live thereon. While living there she had as a companion a certain Miss Joy. Dr. Hughes testified that he heard reports from Miss Yoakum's then attorney, John Preston King, that Miss Yoakum was being imposed upon by Miss Joy. The then wife of the doctor visited the ranch and convinced herself that Miss Joy was an undesirable character. The next week Dr. Hughes visited Miss Yoakum, and, after

some difficulty, succeeded in getting her to visit attorney King. He convinced her that she had been imposed upon by Miss Joy, and the latter was dismissed. According to Dr. Hughes, Miss Yoakum then asked him and King how she could protect herself against designing persons. King advised her to put her property in trust with the income payable to her for life. Miss Yoakum advised King to prepare the documents, to name S. E. Biddle, or the bank of which he was then president, respondent First National Bank of Oakland, as trustee, and to name Dr. Hughes as remainderman. Biddle was well-known to Miss Yoakum, having advised her for many years. King prepared such a trust, naming the bank as trustee, and giving the trustor power of revocation. Biddle suggested that in order to protect Miss Yoakum from designing persons there should be some limitation on the right of revocation. At his suggestion, the trust as originally drafted was amended to provide that the power of revocation should be subject to the consent of the trustee. The trust was executed, together with a will naming Dr. Hughes as legatee, and the documents delivered to the bank. Miss Yoakum then returned to her ranch. This was in February, 1929.

Some time in 1928 Miss Yoakum had become acquainted with Mr. and Mrs. Feyler, then residents of San Francisco. Mr. Feyler worked for a carnival and Mrs. Feyler was a medium and card reader. Miss Yoakum frequently visited the Feylers. Mrs. Feyler was dead at the time of the trial, but Mr. Feyler was called as a witness by the plaintiffs. He testified that Miss Yoakum informed them about the Tulare ranch and invited them to make their home with her. The Feylers moved to the ranch in March of 1929. He testified that the arrangement was that he was to work the ranch on a 50–50 basis for Miss Yoakum; that the Feylers were to live with Miss Yoakum on the ranch; that because Miss Yoakum was short of cash he put five or six hundred dollars of his own money into the ranch. Also living with Miss Yoakum at this time, as companion, was a Mrs. Vermillion. The Feylers admittedly started a campaign to get rid of Mrs. Vermillion. He testified that this was done because Miss Yoakum was paying Mrs. Vermillion too much, and Mrs. Feyler could perform the services rendered by Mrs. Vermillion. In a short time Mrs. Vermillion was discharged. Feyler testified very

frankly that when they discovered that Miss Yoakum's money was tied up in a trust they commenced a program to induce her to revoke the trust. Whether this was done with an improper motive, and whether Miss Yoakum was improperly influenced to revoke the trust, is one of the vital issues in the case. Feyler testified that the house on the ranch was in very poor condition and not at all suitable for Miss Yoakum; that Miss Yoakum needed more cash than the income of the trust to properly operate the ranch. He also testified that neither he nor Mrs. Feyler ever conspired to get Miss Yoakum's money for themselves, or to deprive her of her property; that it was always their belief that the property should go to Dr. Hughes upon the death of Miss Yoakum, but that they felt that Dr. Hughes had succeeded in getting the property tied up in trust and that this was not fair to Miss Yoakum. There is not one word of evidence that the Feylers ever received any of the property from Miss Yoakum. Miss Yoakum was undoubtedly short of cash. Pursuant to their plan to get Miss Yoakum to revoke the trust, Mrs. Feyler took over all of the financial affairs of the ranch, writing all of the checks, and nearly all correspondence, Miss Yoakum merely signing documents presented to her. The Feylers undermined Dr. Hughes by telling Miss Yoakum that the doctor had induced her to tie up her property in a trust, and thus deprived her of her own property. Miss Yoakum had purchased a Stutz automobile from Dr. Hughes and undoubtedly the Feylers fostered the idea that Miss Yoakum had been defrauded in the deal. Mrs. Feyler wrote various "spirit" letters to Miss Yoakum and one to Dr. Hughes in furtherance of her plan to break the trust.

About a week after the Feylers arrived at the ranch, under date of March 30, 1929, Miss Yoakum wrote to the bank demanding the return of her will. This letter was in the handwriting of Miss Yoakum and was signed by her. The bank did not immediately comply. Under date of April 9, 1929, Miss Yoakum wrote to the trust officer of the bank demanding the return of the will. This letter, in addition, stated that she was dissatisfied with the Stutz and felt that Dr. Hughes had defrauded her. Clark notified Dr. Hughes of the receipt of this letter, and Dr. Hughes sent his wife to see Mr. Clark. She showed him the "spirit" letters, and specimens of Mrs. Feyler's handwriting which she had pro-

cured. She testified that she showed these documents to Mr. Clark of the trust department of the bank and gave him other information about the activities of the Feylers. The bank, upon the advice of its counsel, Mr. Eliassen, returned the will to Miss Yoakum.

There can be no doubt that during this period Miss Yoakum was short of the cash necessary to operate the ranch. She finally retained the legal firm of Dorsey and Campbell of Bakersfield, and requested them to prepare the proper documents so that she could revoke the trust. They communicated with the bank, and finally tendered a formal revocation of the trust signed by Miss Yoakum. Mr. Dorsey, about June 21, 1929, came to Oakland and personally delivered the request for a revocation to the bank. Dr. Hughes testified that Clark telephoned him and told him about the request and promised him the bank would not consent to a revocation. Dr. Hughes' then wife testified that Clark, Richardson, Eliassen and Biddle had, on several occasions, promised her that the bank would not consent to a revocation. Clark, Richardson and Eliassen denied making such promises.

Various letters passed between the bank and Dorsey. Finally, under date of June 29, 1929, Eliassen wrote Dorsey that the bank would give its consent to the revocation if the bank were properly indemnified. Thereafter, a suitable indemnification agreement was executed, and consent to the revocation given by the bank. The first such consent was signed by Clark, the trust officer who had signed the declaration of trust on behalf of the bank, and is dated June 21, 1929. When it was delivered to Miss Yoakum or to her attorneys does not appear. On August 15, 1929, a formal consent to the revocation was signed by F. B. Richardson as vice-president of the bank, and by Clark as trust officer. Eliassen testified that when he had discovered that Miss Yoakum had independent competent legal advice, and had been assured by her counsel that she was mentally competent, he agreed to the revocation.

Biddle, who has since severed his relationship with the bank, testified he never was consulted about the consent to the revocation and knew nothing about it, and would not have consented to it had he known about it. In this regard he was directly contradicted by Eliassen, Richardson and Clark. Clark testified that Biddle knew of the revocation and di-

rected him to sign the consent thereto. Richardson testified to the same effect. Eliassen testified he discussed the matter only with Richardson and Clark and not with Biddle because the latter was angry at Mrs. Hughes and referred to her as a "pest," and had stated that he wanted nothing more to do with the trust.

About the middle of September, 1929, Miss Yoakum, through Dorsey and Campbell, commenced a quiet title action in Tulare County naming Dr. Hughes and the bank as defendants. Biddle, as president of the bank, signed a disclaimer. Dr. Hughes appeared in that action and was represented by attorney King who had drawn the trust. Dr. Hughes was present at the trial. The trial court quieted Miss Yoakum's title as against any claims of the bank or of Dr. Hughes. This decree was entered in February of 1930. After this decree became final all of the trust property was returned by the bank to Miss Yoakum. Neither Miss Yoakum, during her lifetime, nor her representatives, since her death, have complained concerning the actions of the bank.

One other matter should be mentioned. The record shows that in December of 1929 the Feylers and Miss Yoakum parted company. In that month Feyler and his wife were forced to leave the ranch and later he sued Miss Yoakum. It is perfectly clear that whatever influence the Feylers had upon Miss Yoakum terminated at this time.

Miss Yoakum remained in full possession and control of her estate until her death in January of 1935. The value of her estate does not appear. In February of 1936 this action was instituted.

Under this state of facts it must be apparent that there is evidence in the record to support the finding of the trial court that there was a valid revocation. While there is evidence that would have supported a finding that the revocation was the result of the undue influence of the Feylers, and that the bank knew, or should have known this fact, there is also evidence to the contrary. There is evidence that Miss Yoakum needed cash badly and that she had independent and competent legal advice on the matter. While it is true that the bank did not investigate the situation in detail, they knew that Miss Yoakum had competent counsel and that such

counsel had informed its officers that Miss Yoakum was competent, and was not acting under the undue influence of any person. The case is simply one where the evidence and reasonable inferences therefrom are in conflict. Under such circumstances, the finding cannot be disturbed.

■ The appellants argue at length that the consent to the revocation was improperly executed and was not the corporate act of the bank. The point is made that neither the trust committee of the bank nor its board of directors specifically consented by resolution to the revocation. It is urged that Mr. Clark, the trust officer, and Mr. Richardson, cashier and vice-president, had no legal authority to consent to the revocation. Clark had signed the original declaration of trust on behalf of the bank. There is no evidence that the board of directors specifically authorized him to do so. If only the board could consent to a revocation, then only the board could consent to accepting the trust. If appellants are correct in their contention the trust would be invalid from its inception.

The complete answer to this contention of appellants is that in 1927, by formal resolution, the bank had specifically authorized Richardson and Clark to transact the business of the trust department. The consent to the revocation was part of the regular business of that department and well within Clark's and Richardson's express authority.

The contention is made that the consent was fraudulently given, therefore invalid, in that Clark, Richardson and Eliassen kept the fact that such consent had been given from Biddle, the president. His testimony that he had no knowledge of the matter was directly contradicted by Richardson, Clark and Eliassen. This conflict must be resolved in favor of respondents.

The other contentions of appellants are too unsubstantial to require comment.

The judgment appealed from is affirmed.

Knight, J., and Ward, J., concurred.

A petition for a rehearing was denied November 29, 1941, and appellants' petition for a hearing by the Supreme Court was denied December 29, 1941. Carter, J., voted for a hearing.